**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| MATTHEW ENGLAND, *on behalf of himself and all others similarly situated,* ) ) ) | |
| *Plaintiff,* ) ) ) | Case No.: |
| ) ) ) | **COMPLAINT – CLASS ACTION** |
| **v.** ) ) ) | **JURY TRIAL DEMANDED** |
| NATIONSTAR MORTGAGE LLC d/b/a MR. COOPER; and MR. COOPER GROUP, INC., ) ) ) | |
| *Defendants,* ) | |

Plaintiff Matthew England ("Plaintiff"), on behalf of himself and the proposed class defined below, alleges as follows:

## NATURE OF THE ACTION

1.      Defendant NATIONSTAR MORTGAGE LLC d/b/a MR. COOPER ("Nationstar") is one of the largest mortgage servicers, and the largest non-bank mortgage servicer, in the United States.

2.      Defendant MR. COOPER GROUP, INC. ("Mr. Cooper", and collectively with Nationstar, "Defendants") provides servicing, origination and transaction-based services related to single family residences throughout the United States, collectively with its consolidated subsidiaries. Nationstar is Mr. Cooper's primary operating subsidiary.

3.      This action arises from a cyberattack that crippled Defendants' data systems in the fall of last year.

1

4.     On or about November 1, 2023, Defendants "shut down [their] IT systems, including access to their online payment portal."[1]



5.     As shown above, Defendants explained that their reason for disabling their payment portal—and several other critical IT systems—was a "system/technical outage". In reality, Defendants' systems were infiltrated by a cyberattack.

6.     As Defendants would later explain, on October 31, 2023, they "detected suspicious activity in certain network systems…" (the "Data Breach").[2] That prompted them to "initiate[] response protocols, launch[] an investigation with the assistance of cybersecurity experts to determine the nature and scope of the incident, and contact[] law enforcement."[3]

---

[1] *Mortgage giant Mr. Cooper hit by cyberattack impacting IT systems*, BLEEPING COMPUTER, *available at* https://www.bleepingcomputer.com/news/security/mortgage-giant-mr-cooper-hit-by-cyberattack-impacting-it-systems/, (last accessed Jan. 24, 2024).
[2] *Mr. Cooper Cyber Incident Update*, MR. COOPER, *available at* https://mrcooperincident.com/, (last accessed Jan. 24, 2024).
[3] *Ibid.*

7.      Defendants have not provided any additional information regarding the mechanism of the Data Breach itself—although ransomware seems likely[4]. Indeed, neither Defendants' notice to customers[5], nor their reporting to the states' attorneys general[6], nor their filing with the U.S. Securities and Exchange Commission under its Incident Disclosure Rule[7] provide any additional information about how Defendants let this happen.

8.      Defendants did provide two important updates, however.

9.      First, Defendants eventually admitted that, not only were their data systems infiltrated by cybercriminals, but those cybercriminals also succeeded in exfiltrating customers' data from those systems.[8] The compromised data included customers' names, addresses, phone numbers, Social Security numbers, dates of birth and bank account numbers.[9]

---

[4] *Mortgage giant Mr. Cooper hit by cyberattack impacting IT systems*, *supra*, n.1.

[5] *See, e.g.*, *Mr. Cooper Cyber Incident Update*, *supra*, n.2.

[6] *See, e.g.*, *Office of the Maine AG: Consumer Protection Privacy, Identity Theft and Data Security Breaches*, OFFICE OF THE MAINE ATTORNEY GENERAL, *available at* https://apps.web.maine.gov/online/aeviewer/ME/40/176a338a-f640-43d5-b975-5996823e7ce4.shtml, (last accessed Jan. 24, 2024).

[7] *Mr. Cooper Group Inc. Form 8-K/A*, UNITED STATES SECURITIES AND EXCHANGE COMMISSION, *available at* https://d18rn0p25nwr6d.cloudfront.net/CIK-0000933136/9f17bad3-d6a5-49d4-871b-4170e96bf833.pdf, (Dec. 15, 2023).

[8] *See, e.g.*, *ibid.*

[9] *See, e.g.*, *Office of the Maine AG: Consumer Protection Privacy, Identity Theft and Data Security Breaches*, *supra*, n.6. Indeed, since Defendants provided their Notice Letter to the Office of the Maine Attorney General, that means that Defendants have "conduct[ed] in good faith a reasonable and prompt investigation to determine the likelihood that personal information has been or will be misused and… [they determined that] *personal information has been, or is reasonably believed to have been, acquired by an unauthorized person.*" 10 M.R.S.A. § 1348 (emphasis added).

3

10.     Second, Defendants ultimately admitted the scope of the Data Breach—and it was vast—Defendants admitted the ("PII")[10] of "substantially all of [its] current and former customers"—more than 14.6 million in total—was compromised.[11]

11.     Yet, upon information and belief, Defendants did not start notifying victims of the Data Breach until December 15, 2023—months after it initially discovered it.

12.     Despite the seriousness of the Data Breach, which impacted millions of its customers' PII, Defendants chose to only offer two-years of identity theft protection which monitors only *a single credit bureau* and does not adequately address the harm their customers have and will continue to suffer.

13.     Defendants should have known that the Data Breach's victims deserved prompt and efficient notice of the Data Breach and meaningful assistance in mitigating the effects of PII misuse.

14.     At worst, Defendants, upon information or belief, knew the severity of the Data Breach but chose to ignore and downplay the size and scope of the Data Breach in its disclosures to regulators and the public.

---

[10] The Federal Trade Commission defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 17 C.F.R. § 248.201(b)(8). To be clear, Plaintiff is not asserting that every example of identifying information was compromised in the Data Breach.

[11] *See, e.g., Mr. Cooper Group Inc. Form 8-K/A, supra,* n.7; *see also Office of the Maine AG: Consumer Protection Privacy, Identity Theft and Data Security Breaches, supra,* n.6.

15.    Plaintiff and members of the proposed class are victims of Defendants' negligence and deceptive trade practices. Specifically, Plaintiff and members of the proposed class trusted Defendants with their PII. But Defendants betrayed that trust. Defendants failed to properly industry standard cybersecurity practices to prevent the Data Breach, and when the Data Breach was discovered, Defendants attempted to downplay the Data Breach's impact by failing to provide the victims with meaningful notice or assistance.

16.    Defendants' negligence and deceptive practices caused real and substantial damage to Plaintiff and members of the proposed class.

17.    Plaintiff and members of the proposed class therefore bring this lawsuit seeking damages and restitution for Defendants' actions.

## THE PARTIES

18.    Plaintiff Matthew England is a natural person and citizen of the State of Colorado, residing in Highlands Ranch, Colorado, where he intends to remain. Plaintiff Matthew England was a mortgagor whose mortgage was serviced by Defendants.

19.    Defendant Nationstar is a Foreign Limited Liability Company, organized under the laws of the State of Delaware, which maintains its principal office at 8950 Cypress Waters Blvd., Coppell, Texas 75019. According to one of its business filings with the Texas Secretary of State, Nationstar's principal place of business is in this District and it, as an LLC, has two total members: (1) Jay Bray (manager member); and (2) Peter Smith (manager member). Member Jay Bray, an

individual, is domiciled in the State of Texas, a citizen of the State of Texas, and upon information and belief, intends to remain in Texas. Member Peter Smith is domiciled in the State of Texas, a citizen of the State of Texas, and, upon information and belief, intends to remain in Texas.

20.    Defendant Mr. Cooper, formerly Nationstar Mortgage Holdings Inc., is a Foreign Corporation, incorporated under the laws of the State of Delaware, which maintains its principal office at 8950 Cypress Waters Blvd., Coppell, Texas 75019.

## JURISDICTION AND VENUE

21.    This Court has subject matter jurisdiction over this cause pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because it is brought on behalf of a proposed class with at least 100 members for whom the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interests and costs, and Plaintiff and other members of the class are citizens of a State and/or States different from Defendants.

22.    This Court has general personal jurisdiction over Defendants because Defendants' principal places of business are one-and-the-same in Texas, and they regularly transact business within the State, such that they are at home within the forum.

23.    Venue is proper in this Court under 28 U.S.C. § 1391(a)(2), (b)(2) & (c)(2), because a substantial part of the events giving rise to the claims arise from Defendants' business activities in this District.

## COMMON FACTUAL ALLEGATIONS

**A.     Defendants' Failure to Prevent the Data Breach**

24.     Plaintiff and members of the proposed class are current and former customers of Defendants.

25.     As a requisite to receiving their mortgage related services, Defendants require their customers to provide their PII.

26.     Defendants maintain records of their customers' PII such as their names, addresses, phone numbers, Social Security numbers, dates of birth and bank account numbers, in the ordinary course of their business. These records are stored on Defendants' computer systems.

27.     Defendants inform their customers the way they collect, maintain, and safeguard their PII through their Privacy Policy (Defendants' "Privacy Policy").[12]

28.     In their Privacy Policy, Defendants represent:

**Protecting The Confidentiality And Security Of Your Information**

Keeping financial information is one of our most important responsibilities. Only those persons who need it to perform their job responsibilities are authorized to access your information. We take commercially reasonable precautions to protect your information and limit disclosure by maintaining physical, electronic and procedural safeguards.

29.     Defendants represented to their customers that they would take "commercially reasonable precautions" to keep their PII secure, and Plaintiff and members of the proposed class reasonably relied on that representation.

---

[12] *See Privacy Policy | Mr. Cooper Home Loans – Legal Documentation*, MR. COOPER, *available at* https://www.mrcooper.com/privacy, (last visited Jan. 24, 2024).

30.    Yet Defendants failed to take commercially reasonable precautions to safeguard their customers' PII and prevent the Data Breach that ultimately came to pass.

31.    On or about October 31, 2023, Defendants discovered that the PII of their former and current customers was compromised.

32.    According to Defendants' consumer notices, on October 31, 2023, they "detected suspicious activity in certain network systems…"[13] That prompted them to "initiate[] response protocols, launch[] an investigation with the assistance of cybersecurity experts to determine the nature and scope of the incident, and contact[] law enforcement."[14]

33.    Despite purportedly engaging those "cybersecurity experts", Defendants' consumer notices do not specify when the Data Breach occurred or elaborate on the mechanism of how it happened.

34.    Although Defendants never told their customers, they reported to the SEC and the Office of the Maine Attorney General that the PII of "substantially all of [their] current and former customers"—more than 14.6 million in total—was compromised.[15]

---

[13] *Mr. Cooper Cyber Incident Update*, *supra*, n.2.
[14] *Ibid.*
[15] *Mr. Cooper Group Inc. Form 8-K/A*, *supra*, n.7; *see also Office of the Maine AG: Consumer Protection Privacy, Identity Theft and Data Security Breaches*, *supra*, n.6.

35.     Defendants stated that the PII accessed by unauthorized actors included Plaintiff's and class members' "name[s], address[es], phone number[s], Social Security number[s], date[s] of birth, bank account number[s]."[16]

36.     In response to the Data Breach, Defendants contend that they "immediately took steps to identify and remediate it, including locking down [their] systems, changing account passwords, and restoring [their] systems…", and "further enhanc[ed] the security of [their] systems to help prevent incidents like this from happening in the future…", thereby acknowledging that their systems were not secure at the time of the Data Breach. *Ibid.*

37.     Upon information and belief, Defendants failed to adequately train their customers on even the basic cybersecurity protocols, including:

a.     Effective password management and encryption protocols, including, but not limited to, the use of Multi-Factor Authentication for all users;

b.     Locking, encrypting and limiting access to computers and files containing sensitive information;

c.     Implementing guidelines for maintaining and communicating sensitive data;

d.     Protecting sensitive consumer information, including personal and financial information, by implementing protocols on how to request and respond to requests for the transfer of such information and how to securely

---

[16] *Office of the Maine AG: Consumer Protection Privacy, Identity Theft and Data Security Breaches*, *supra*, n.6.

send such information through a secure file transfer system to only known recipients; and

e.    Providing focused cybersecurity awareness training programs for customers.

38.    Defendants' negligent conduct caused the Data Breach. Defendants violated their obligation to implement best practices and comply with industry standards concerning computer system security. Defendants failed to comply with security standards and allowed its customers' PII to be accessed and stolen by failing to implement security measures that could have prevented or mitigated the Data Breach.

39.    Defendants reported the Data Breach to the SEC shortly after it happened on or about November 2, 2023, yet failed to notify its customers—the Data Breach victims—of same until over one month later, on or about December 15, 2023.

40.    Defendants encouraged their current and former customers to "remain vigilant for incidents of fraud and identity theft by reviewing account statements and monitoring your credit report for unauthorized activity."[17]

41.    Defendants also suggested that victims of the Data Breach contact the three credit-reporting bureaus to either place a "security freeze" or a "fraud alert" on their credit reports. *Ibid.*

---

[17] *Ibid.*

10

**B.**    **Plaintiff and the Proposed Class Face Significant Risk of Identity Theft**

42.    Plaintiff and members of the proposed class have suffered injury from the misuse of their PII that can be directly traced to Defendants.

43.    The ramifications of Defendants' failure to keep Plaintiff's and the Class's PII secure are severe. Identity theft occurs when someone uses another's personal and financial information such as that person's name, address, phone number, Social Security number, date of birth, bank account number, and/or other information, without permission, to commit fraud or other crimes.

44.    According to experts, one out of four data breach notification recipients becomes a victim of identity fraud.[18]

45.    As a result of Defendants' failure to prevent the Data Breach, Plaintiff and the proposed class have suffered and will continue to suffer damages, including monetary losses, lost time, anxiety, and emotional distress. They have suffered or are at an increased risk of suffering:

a.    The loss of the opportunity to control how their PII is used;

b.    The diminution in value of their PII;

c.    The compromise and continuing publication of their PII;

d.    Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

---

[18] *Study Shows One in Four Who Receive Data Breach Letter Become Fraud Victims*, ThreatPost.com *available at* https://threatpost.com/study-shows-one-four-who-receive-data-breach-letter-become-fraud-victims-022013/77549/.

11

e.    Lost opportunity costs and lost wages associated with the time and effort expended addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

f.    Delay in receipt of tax refund monies;

g.    Unauthorized use of stolen PII; and

h.    The continued risk to their PII, which remains in the possession of Defendants and is subject to further breaches so long as Defendants fails to undertake the appropriate measures to protect the PII in their possession.

46.    Stolen PII is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PII can be worth up to $1,000.00 depending on the type of information obtained.[19]

47.    The value of Plaintiff's and the proposed class's PII on the black market is considerable. Stolen PII trades on the black market for years, and criminals frequently post stolen private information openly and directly on various "dark web" internet websites, making the information publicly available, for a substantial fee of course.

48.    It can take victims years to spot identity or PII theft, giving criminals plenty of time to milk that information for cash.

---

[19] *See* Brian Stack, *Here's How Much Your Personal Information is Selling for on the Dark Web*, EXPERIAN, (Dec. 15, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited Sept. 22, 2021).

49.    One such example of criminals using PII for profit is the development of "Fullz" packages.[20]

50.    Cyber-criminals can cross-reference multiple sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

51.    The development of "Fullz" packages means that stolen PII from the Data Breach can easily be used to link and identify it to Plaintiff's and the proposed class's phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and members of the proposed class, and it is reasonable for any trier of fact, including this

---

[20] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record or more on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz", which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.*, Brian Krebs, *Medical Records For Sale in Underground Stolen From Texas Life Insurance Firm*, KREBS ON SECURITY, (Sep. 18, 2014), *available at* https://krebsonsecurity.com/tag/fullz/, (last visited Sept. 22, 2021).

Court or a jury, to find that Plaintiff's and other members of the proposed class's stolen PII is being misused, and that such misuse is fairly traceable to the Data Breach.

52.    According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.

53.    Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good." Defendant did not rapidly report to Plaintiff and the Class that their PII had been stolen.

54.    Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

55.    Moreover, considering the COVID-19 pandemic, Plaintiff's and the Class's PII can be used to fraudulently obtain emergency stimulus or relief payments or other forms of monetary compensation, unemployment and/or enhanced unemployment benefits.

56.    In addition to out-of-pocket expenses that can exceed thousands of dollars for the victim of new account identity theft, and the emotional toll identity theft can take, some victims have to spend a considerable time repairing the damage caused by the theft of their PII. Victims of new account identity theft will likely have

to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

57. Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen PII. To protect themselves, Plaintiff and the Class will need to remain vigilant against unauthorized data use for years or even decades to come.

58. The Federal Trade Commission ("FTC") has also recognized that consumer data is a new and valuable) form of currency. In an FTC roundtable presentation, former Commissioner, Pamela Jones Harbour, stated that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency."[21]

59. The FTC has also issued numerous guidelines for businesses that highlight the importance of reasonable data security practices. The FTC has noted the need to factor data security into all business decision-making.[22] According to the FTC, data security requires: (1) encrypting information stored on computer networks; (2) retaining payment card information only as long as necessary; (3) properly disposing of personal information that is no longer needed; (4) limiting administrative

---

[21] *Statement of FTC Commissioner Pamela Jones Harbour – Remarks Before FTC Exploring Privacy Roundtable*, (Dec. 7, 2009),
http://www.ftc.gov/speeches/harbour/091207privacyroundtable.pdf (last visited September 22, 2021).
[22] *Start With Security, A Guide for Business*, FTC (last visited Sept. 22, 2021),
https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf

access to business systems; (5) using industry-tested and accepted methods for securing data; (6) monitoring activity on networks to uncover unapproved activity; (7) verifying that privacy and security features function properly; (8) testing for common vulnerabilities; and (9) updating and patching third-party software.[23]

60.    According to the FTC, unauthorized PII disclosures are extremely damaging to consumers' finances, credit history and reputation, and can take time, money and patience to resolve the fallout.[24] The FTC treats the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5(a) of the FTC Act.

61.    To that end, the FTC has issued orders against businesses that failed to employ reasonable measures to secure sensitive payment card data. *See In the matter of Lookout Services, Inc.*, No. C-4326, ¶ 7 (June 15, 2011) ("[Defendant] allowed users to bypass authentication procedures" and "failed to employ sufficient measures to detect and prevent unauthorized access to computer networks, such as employing an intrusion detection system and monitoring system logs."); *In the matter of DSW, Inc.*, No. C-4157, ¶ 7 (Mar. 7, 2006) ("[Defendant] failed to employ sufficient measures to detect unauthorized access."); *In the matter of The TJX Cos., Inc.*, No. C-4227 (Jul. 29, 2008) ("[R]espondent stored . . . personal information obtained to verify checks and process unreceipted returns in clear text on its in-store and corporate

---

[23] *Ibid.*
[24] *See Taking Charge, What to Do If Your Identity is Stolen*, FTC, at 3 (2012), *available at* www.consumer.ftc.gov/articles/pdf-0009-taking-charge.pdf (last visited April 28, 2021).

networks[,]" "did not require network administrators . . . to use different passwords to access different programs, computers, and networks[,]" and "failed to employ sufficient measures to detect and prevent unauthorized access to computer networks . . ."); *In the matter of Dave & Buster's Inc.*, No. C-4291 (May 20, 2010) ("[Defendant] failed to monitor and filter outbound traffic from its networks to identify and block export of sensitive personal information without authorization" and "failed to use readily available security measures to limit access between instore networks . . ."). These orders, which all preceded the Data Breach, further clarify the measures businesses must take to meet their data security obligations.

62.    Defendants disclosed the PII of Plaintiff and members of the proposed class for criminals to use in the conduct of criminal activity. Specifically, Defendants opened up, disclosed, and exposed the PII of Plaintiff and members of the proposed class to people engaged in disruptive and unlawful business practices and tactics, including online account hacking, unauthorized use of financial accounts, and fraudulent attempts to open unauthorized financial accounts (*i.e.*, identity fraud), all using the stolen PII.

63.    Defendants' use of outdated and insecure computer systems and software that are easy to hack, and its failure to maintain adequate security measures and an up-to-date technology security strategy, demonstrates a willful and conscious disregard for privacy, and has exposed the PII of Plaintiff and millions of members of the proposed class to unscrupulous operators, con artists and outright criminals.

64.    Defendants' failure to properly and promptly notify Plaintiff and members of the proposed class of the Data Breach exacerbated Plaintiff's and members of the proposed class's injury by depriving them of the earliest ability to take appropriate measures to protect their PII and take other necessary steps in an effort to mitigate the harm caused by the Data Breach.

65.    Upon information and belief, Defendants knew the severity of the Data Breach but chose to downplay the Data Breach's impact. In its Notice Letter, Defendants stated that the Data Breach "may have involved some of…" Plaintiff's and the members of the class's PII, but then proceeded to report to, *inter alios*, the SEC and Office of the Maine Attorney General that the PII "relating to substantially all of [their] current and former customers was obtained from [their] systems during this incident."

<u>**PLAINTIFF'S EXPERIENCE**</u>

66.    Matthew England is a citizen of Colorado who resides in Highland Ranch, Colorado, where he intends to remain.

67.    Plaintiff was a mortgagor whose mortgage was serviced by Defendants.

68.    As a condition precedent to Defendants' mortgage related services, they required Plaintiff to provide them with his PII, including his name, address, phone number, Social Security number, date of birth and bank account number.

69.    Plaintiff provided Defendants with his PII in order to receive their mortgage related services.

70. Plaintiff became aware that his PII was impacted by the Data Breach when he received a copy of Defendants' Notice Letter, which notified him of same, and is attached hereto as Plaintiff's *Exhibit A*.

71. Plaintiff has been forced to incur out-of-pocket expenses as a result of the Data Breach, as he has enrolled in a paid credit monitoring service.

72. To Plaintiff's knowledge, he has never been the victim of any data breach other than the one from which this Action arises.

73. As a result of the Data Breach, Plaintiff spent considerable time and effort monitoring his accounts to protect himself from additional identity theft. Plaintiff fears for his personal financial security and is experiencing feelings of rage and anger, anxiety, sleep disruption, stress, fear, and physical pain. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that is contemplated and addressed by law.

74. Plaintiff remains at a continued risk of harm due to the exposure and potential misuse of his personal data by criminal hackers.

## CLASS ACTION ALLEGATIONS

75. Plaintiff brings this action pursuant to Fed. R. Civ. Proc. 23 on behalf of himself and all members of the proposed class (the "Class") as defined as:

> All customers of Defendants whose PII was potentially accessed without authorization in the Data Breach.

76. The following people are excluded from the Class: (1) any judge or magistrate presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, affiliated entities, and

any entity in which Defendants or their parent has a controlling interest, and their current or former officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons, except for Defendants' current, former and prospective customers.

77.    Plaintiff and members of the Class satisfy the numerosity, commonality, typicality, adequacy, and predominance prerequisites for suing as representative parties.

78.    **Numerosity:** The exact number of members of the Class is unknown but, upon information and belief, it is estimated to approximate 14,690,284, and individual joinder in this case is impracticable. Members of the Class can be easily identified through Defendants' records and objective criteria permitting self-identification in response to notice, and notice can be provided through techniques like those customarily used in other data breach, consumer breach of contract, unlawful trade practices, and class action controversies.

79.    **Typicality**: Plaintiff's claims are typical of the claims of other members of the Class in that Plaintiff, and the members of the Class sustained damages arising out of Defendants' Data Breach, wrongful conduct and misrepresentations, false statements, concealment, and unlawful practices, and Plaintiff and members of the

Class sustained similar injuries and damages, because of Defendants' uniform illegal conduct.

80.     **Adequacy**: Plaintiff will fairly and adequately represent and protect the interests of the Class and has retained counsel competent and experienced in complex class actions to vigorously prosecute this action on behalf of the Class. Plaintiff has no interests that conflict with or are antagonistic to those of the Class and Defendants have no defenses unique to Plaintiff.

81.     **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiff and the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include, but are not necessarily limited to the following:

a.      Whether Defendants violated the laws asserted herein, including statutory privacy laws;

b.      Whether Defendants had a duty to use reasonable care to safeguard Plaintiff's and members of the Class's PII;

c.      Whether Defendants breached the duty to use reasonable care to safeguard members of the Class's PII;

d.      Whether Defendants breached their contractual promises to safeguard Plaintiff's and members of the Class's PII;

e.      Whether Defendants knew or should have known about the inadequacies of their data security policies and system and the dangers associated with storing sensitive PII;

f.      Whether Defendants failed to use reasonable care and commercially reasonable methods to safeguard and protect Plaintiff's and members of the Class's PII from unauthorized release and disclosure;

g.      Whether the proper data security measures, policies, procedures, and protocols were in place and operational within Defendants' computer systems to safeguard and protect Plaintiff's and members of the Class's PII from unauthorized release and disclosure;

h.      Whether Defendants took reasonable measures to determine the extent of the Data Breach after it was discovered;

i.      Whether Defendants' delay in informing Plaintiff and members of the Class of the Data Breach was unreasonable;

j.      Whether Defendants' method of informing Plaintiff and other members of the Class of the Data Breach was unreasonable;

k.      Whether Defendants' conduct was likely to deceive the public;

l.      Whether Defendants are liable for negligence or gross negligence;

m.      Whether Defendants' conduct, practices, statements, and representations about the Data Breach violated applicable state laws;

n.      Whether Defendants' practices and representations related to the Data Breach breached implied warranties;

22

o.    What the proper measure of damages is; and

p.    Whether Plaintiff and members of the Class are entitled to restitutionary, injunctive, declaratory, or other relief.

82.    **Superiority:** A class action is also a fair and efficient method of adjudicating the controversy because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy as joinder of all parties is impracticable. The damages suffered by the individual members of the Class will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' actions. Thus, it would be virtually impossible for the individual members of the Class to obtain effective relief from Defendants' misconduct. Even if members of the Class could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered, and uniformity of decisions ensured.

83.    A class action is therefore superior to induvial litigation because:

a.    The amount of damages available to an individual plaintiff is insufficient to make litigation addressing Defendants' conduct economically feasible in the absence of the class action procedural device;

b.     Individualized litigation would present a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system; and

c.     The class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

## COUNT I
### Negligence
### (On Behalf of Plaintiff and the Class)

84.     Plaintiff and members of the Class incorporate the above allegations as if fully set forth herein.

85.     Plaintiff and members of the Class entrusted their PII to Defendants. Defendants owed to Plaintiff and other members of the Class a duty to exercise reasonable care in handling and using the PII in its care and custody, including implementing industry-standard security procedures sufficient to reasonably protect the information from the Data Breach, theft, and unauthorized use that came to pass, and to promptly detect attempts at unauthorized access.

86.     Defendants owed a duty of care to Plaintiff and members of the Class because it was foreseeable that Defendants' failure to adequately safeguard their PII in accordance with state-of-the-art industry standards concerning data security would result in the compromise of that PII—just like the Data Breach that ultimately came to pass. Defendants acted with wanton and reckless disregard for the security and confidentiality of Plaintiff's and members of the Class's PII by disclosing and

24

providing access to this information to third parties and by failing to properly supervise both the manner in which the PII was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

87.     Defendants owed to Plaintiff and members of the Class a duty to notify them within a reasonable time frame of any breach to the security of their PII. Defendants also owed a duty to timely and accurately disclose to Plaintiff and members of the Class the scope, nature, and occurrence of the Data Breach. This duty is required and necessary for Plaintiff and members of the Class to take appropriate measures to protect their PII, to be vigilant in the face of an increased risk of harm, and to take other necessary steps in an effort to mitigate the harm caused by the Data Breach.

88.     Defendants owed these duties to Plaintiff and members of the Class because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendants knew or should have known would suffer injury-in-fact from Defendants' inadequate security protocols. Defendants actively sought and obtained Plaintiff's and members of the Class's personal information and PII for mortgage related tasks. Plaintiff and members of the Class were required to provide their personal information and PII to Defendants to receive mortgage related services from Defendants, and Defendants retained that information.

89.     The risk that unauthorized persons would attempt to gain access to the PII and misuse it was foreseeable. Given that Defendants hold vast amounts of PII,

it was inevitable that unauthorized individuals would attempt to access Defendants' databases containing the PII—whether by malware or otherwise.

90.    PII is highly valuable, and Defendants knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII of Plaintiff and members of the Class and the importance of exercising reasonable care in handling it.

91.    Defendants breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the personal information and PII of Plaintiff and members of the Class which actually and proximately caused the Data Breach and Plaintiff's and members of the Class's injury. Defendants further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiff and members of the Class, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiff's and members of the Class's injuries-in-fact. As a direct and traceable result of Defendants' negligence and/or negligent supervision, Plaintiff and members of the Class have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

92.    Defendants' breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiff's and members of the Class's actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their PII by criminals, improper disclosure of their

PII, lost benefit of their bargain, lost value of their PII, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendants' negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

**COUNT II**
**Negligence *Per Se* for Violation of the FTC Act, 15 U.S.C. § 45, and the**
**Gramm-Leach-Bliley Act, 15 U.S.C. § 6801, *et seq*.**
**(On Behalf of Plaintiff and the Class)**

93.     Plaintiff and members of the Class incorporate the above allegations as if fully set forth herein.

94.     Pursuant to the FTC Act, 15 U.S.C. § 45, Defendants had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiff's and members of the Class's PII.

95.     Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendants, of failing to use reasonable measures to protect customers or, in this case, customers' PII. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendants' duty to protect Plaintiff's and the members of the Class's sensitive PII.

96.     Defendants violated their duty under Section 5 of the FTC Act by failing to use reasonable measures to protect its customers' PII and not complying with applicable industry standards as described in detail herein. Defendants' conduct was particularly unreasonable given the nature and amount of PII Defendants had collected and stored and the foreseeable consequences of a data breach, including,

27

specifically, the immense damages that would result to its customers in the event of a breach, which ultimately came to pass.

97.     The harm that has occurred is the type of harm the FTC Act is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and members of the Class.

98.     Moreover, Defendants had a duty under the Gramm-Leach-Bliley Act, 15 U.S.C. § 6801, *et seq.* ("GLBA"), and its Safeguards Rule to develop, implement, and maintain an information security program with administrative, technical, and physical safeguards designed to protect the PII of Plaintiff and the Class.

99.     The harm that has occurred is the type of harm the GLBA is intended to guard against.

100.     Defendants breached their respective duties to Plaintiff and members of the Class under the FTC Act and the GLBA by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and members of the Class's PII.

101.     Defendants' violation of Section 5 of the FTC Act and the GLBA and its failure to comply with applicable laws and regulations constitutes negligence per se.

102.     But for Defendants' wrongful and negligent breach of its duties owed to Plaintiff and members of the Class, Plaintiff and members of the Class would not have been injured.

103.    The injury and harm suffered by Plaintiff and members of the Class were the reasonably foreseeable result of Defendants' breach of its duties. Defendants knew or should have known that it was failing to meet its duties and that its breach would cause Plaintiff and members of the Class to suffer the foreseeable harms associated with the exposure of their PII.

104.    Had Plaintiff and members of the Class known that Defendants did not adequately protect customers' PII, Plaintiff and members of the Class would not have entrusted Defendants with their PII.

105.    As a direct and proximate result of Defendants' negligence per se, Plaintiff and members of the Class have suffered harm, including loss of time and money resolving fraudulent charges; loss of time and money obtaining protections against future identity theft; financial losses related to the employment and commensurate rate of pay Plaintiff and members of the Class accepted that they would not have had they known of Defendants' careless approach to cyber security; lost control over the value of PII; unreimbursed losses relating to fraudulent charges; losses relating to exceeding credit and debit card limits and balances; harm resulting from damaged credit scores and information; and other harm resulting from the unauthorized use or threat of unauthorized use of stolen personal information, entitling them to damages in an amount to be proven at trial.

## COUNT III
**Breach of an Implied Contract**
**(On Behalf of Plaintiff and the Class)**

106.    Plaintiff and members of the Class incorporate the above allegations as if fully set forth herein.

107.    Defendants offered to provide mortgage related services to Plaintiff and members of the Class for payment.

108.    Defendants also required Plaintiff and the members of the Class to provide Defendants with their PII in order to receive those mortgage related services.

109.    In turn, and through the Privacy Policy, Defendants agreed it would not disclose the PII it collects from customers to unauthorized persons. Defendants also promised to maintain safeguards to protect its customers' PII.

110.    Plaintiff and the members of the Class accepted Defendants' offer by providing PII to Defendant in exchange for mortgage related services and consummating the related transactions.

111.    Implicit in the parties' agreement was that Defendants would provide Plaintiff and members of the Class with prompt and adequate notice of any and all unauthorized access and/or theft of their PII.

112.    Plaintiff and the members of the Class would not have entrusted their PII to Defendants in the absence of such agreement with Defendants.

113.    Defendants materially breached the contract(s) it had entered with Plaintiff and members of the Class by failing to safeguard such information and failing to notify them promptly of the intrusion into its computer systems that compromised such information. Defendants further breached the implied contracts with Plaintiff and members of the Class by:

a.    Failing to properly safeguard and protect Plaintiff's and members of the Class's PII; and

b.    Failing to comply with industry standards as well as legal obligations that are necessarily incorporated into the parties' agreement;

114.    The damages sustained by Plaintiff and members of the Class as described above were the direct and proximate result of Defendants' material breaches of its agreement(s).

115.    Plaintiff and members of the Class have performed as required under the relevant agreements, or such performance was waived by the conduct of Defendants.

116.    The convent of good faith and fair dealing is an element of every contract. All such contracts impose upon each party a duty of good faith and fair dealing. The parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

117.    Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.

118.    Defendants failed to advise Plaintiff and members of the Class of the Data Breach promptly and sufficiently.

119.    In these and other ways, Defendants violated their duty of good faith and fair dealing.

120.    Plaintiff and members of the Class have sustained damages as a result of Defendants' breaches of its agreement, including breaches thereof through violations of the covenant of good faith and fair dealing.

### COUNT IV
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Class)**

121.    Plaintiff and members of the Class incorporate the above allegations as if fully set forth herein.

122.    This claim is pleaded in the alternative to the breach of implied contractual duty claim.

123.    Plaintiff and members of the Class conferred a valuable benefit upon Defendants in the form of money.

124.    Defendants appreciated or had knowledge of the benefits conferred upon themselves by Plaintiff and members of the Class. Defendants also benefited from the receipt of Plaintiff's and members of the Class's PII, as this was used to facilitate their mortgage servicing relationship.

125.    As a result of Defendants' conduct, Plaintiff and members of the Class suffered actual damages in an amount equal to the difference in price for mortgage related services with Defendants with reasonable data privacy and security practices

and procedures that Plaintiff and members of the Class expected, and the same without reasonable data privacy and security practices and procedures, which is what they actually received.

126.    Under principles of equity and good conscience, Defendants should not be permitted to retain the money belonging to Plaintiff and members of the Class because Defendants failed to implement (or adequately implement) the data privacy and security practices and procedures for themselves that Plaintiff and members of the Class expected and that were otherwise mandated by federal, state, and local laws and industry standards.

127.    Defendants should be compelled to disgorge into a common fund for the benefit of Plaintiff and members of the Class all unlawful or inequitable proceeds received by it as a result of the conduct and Data Breach alleged herein.

## COUNT V
### Invasion of Privacy
### (On Behalf of Plaintiff and the Class)

128.    Plaintiff and members of the Class incorporate the above allegations as if fully set forth herein.

129.    Defendants publicized private details and facts not generally known to the public, not publicly available, and not of legitimate public concern about Plaintiff and members of the Class by disclosing and exposing Plaintiff's and members of the Class's PII to enough people that it is reasonably likely those facts will become known to the public at large, including, without limitation, on the dark web and elsewhere.

130.    The disclosure of customers' names, addresses, phone numbers, Social Security numbers, dates of birth and bank account numbers is particularly harmful and would be offensive to a reasonable person of ordinary sensibilities.

131.    Defendants have a special relationship with Plaintiff and members of the Class and Defendants' disclosure of PII is certain to embarrass them and offend their dignity. Defendants should appreciate that the cyber-criminals who access PII would further sell and disclose the PII as they are doing. That the original disclosure is devastating to the Plaintiff and the members of the Class, even though it originally may have only been disclosed to one person or a limited number of cyber-criminals, does not render it any less a disclosure to the public-at-large.

132.    Plaintiff's and members of the Class's PII was publicly disclosed by Defendants in the Data Breach with reckless disregard for the reasonable offensiveness of the disclosure. Such disclosure is highly offensive and would be to any person of ordinary sensibilities. Defendants knew or should have known that Plaintiff's and the members of the Class's PII is not a matter of legitimate public concern. As a direct and proximate result of Defendants' conduct, Plaintiff and members of the Class have been injured and are entitled to damages.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, individually and on behalf of the proposed Class, requests that the Court:

A.    Certify this case as a class action on behalf of the Class defined above, appoint Plaintiff as the Class representative, and appoint the undersigned as Class counsel;

B.    Award declaratory and other equitable relief as is necessary to protect the interests of Plaintiff and the Class;

C.    Award injunctive relief as is necessary to protect the interests of Plaintiff and the Class;

D.    Enter an Order enjoining Defendants from further deceptive and unfair practices and making untrue statements with respect to the Data Breach and the stolen PII;

E.    Enter an award in favor of Plaintiff and the Class that includes compensatory, exemplary, punitive damages, and statutory damages, including pre- and post-judgment interest thereon, in an amount to be proven at trial;

F.    Award restitution and damages to Plaintiff and the Class in an amount to be determined at trial;

G.    Enter an award of attorneys' fees and costs, as allowed by law;

H.    Enter an award of prejudgment and post-judgment interest, as provided by law;

I.    Grant Plaintiff and the Class leave to amend this complaint to conform to the evidence produced at trial; and

J.    Grant such other or further relief as may be appropriate under the circumstances.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated:        January 31, 2024.

Respectfully submitted,

**FORESTER HAYNIE PLLC**

*/s/ Jay Forester*
Jay Forester (TX Bar #24087532)
D. Matthew Haynie (TX Bar #24087692)
400 N. St. Paul St. #700
Dallas, Texas 75201
(214) 210-2100 phone
(214) 346-5909 fax
Email: jay@foresterhaynie.com
Email: matthew@foresterhaynie.com

**HERZFELD, SUETHOLZ, GASTEL,
LENISKI & WALL PLLC**

Joe P. Leniski, Jr.* (TN BPR #022891)
223 Rosa Parks Ave., Suite 300
Nashville, Tennessee 37203
(615) 800-6225 phone
(615) 994-8625 fax
Email: joey@hsglawgroup.com

***Pro Hac Vice Pending**

**Attorneys for Plaintiff**